IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DEANDRE DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   19-cv-892-RJD |
| | ) | |
| CHRISTOPHER SCOTT THOMPSON, | ) | |
| PERCY MYERS, CHRISTINE BROWN, | ) | |
| MAC-SHANE FRANK, SYLVIA LANE, | ) | |
| BRYAN KELLEY, LAURA MILEUR, | ) | |
| KELLI BLAISE, JANA RUETER, | ) | |
| WEXFORD INC., RANDY REDDLING, | ) | |
| DANIELLE ANDERTON, JUSTIN | ) | |
| JURKOWSKI, and JANE DOE(S), | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff Deandre Davis, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Pinckneyville Correctional Center.   Plaintiff alleges he received inadequate medical care for his ulcerative colitis and hernia.   Plaintiff also alleges he was sexually assaulted by Pinckneyville Medical Director Dr. Myers, and continued to be treated by Dr. Myers, over Plaintiff's objections.   Plaintiff proceeds on the following claims set forth in his First Amended Complaint (*see* Docs. 45, 47):

Count One:   Eighth Amendment claim against Dr. Myers for deliberate indifference to Plaintiff's serious medical needs regarding his hernia.

Count Two:   Eighth Amendment claim against Dr. Myers for cruel and unusual punishment by sexually assaulting Plaintiff during a medical appointment.

Count Three:   First Amendment claim against Dr. Myers for sexually assaulting Plaintiff

in retaliation for Plaintiff complaining about his medical treatment and filing grievances concerning the same.

Count Four:     Eighth Amendment claim against Lt. Frank, Brown, Dr. Lane, and Dr. Reddling for failing to protect Plaintiff from the risk of another sexual assault by Dr. Myers.

Count Five:     Eighth Amendment claim against Dr. Myers, Christine Brown, K. Blaise, Kelley, Mileur, Rueter, Anderton, and Nurse Jane Doe(s) for deliberate indifference to Plaintiff's serious medical needs regarding treatment for his ulcerative colitis.

Count Six:      Eighth Amendment claim of falsification of medical records by Brown.

Count Seven:    Eighth Amendment deliberate indifference claim against Wexford Health Sources, Inc. for implementing policies that caused him to receive inadequate medical treatment for his hernia.

Count Eight:    First Amendment retaliation claim against Lt. Frank and Warden Thompson for raising Plaintiff's security risk and effecting a disciplinary transfer for Plaintiff due to his filing of grievances and a PREA complaint.

Count Nine:     Eighth Amendment deliberate indifference claim against Officer Jurowski for denying Plaintiff's request for medical attention in June 2019.

This matter is before the Court on the Motion for Summary Judgment filed by Defendants Percy Myers, Bryan Kelley, Laura Mileur, Kelli Blaise, Jana Reuter, Danielle Anderton, and Wexford Health Sources, Inc. (Doc. 138); the Motion for Partial Summary Judgment filed by Plaintiff Deandre Davis (Doc. 140); and the Motion for Summary Judgment filed by Defendants Christopher Scott Thompson, Sylvia Lane, Christine Brown, Mac-Shane Frank, and Justin Jurkowski (Doc. 142).   Responses were timely filed (Docs. 149-153), and a reply filed by the Wexford Defendants was received and considered (Doc. 154).   For the reasons set forth below, the IDOC Defendants' Motion for Summary Judgment is **GRANTED**; the Wexford Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**; and Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

**Factual Background**

Plaintiff was incarcerated at Pinckneyville Correctional Center ("Pinckneyville") from November 28, 2018 to September 11, 2019 (Deposition of Deandre Davis, Doc. 139-1 at 11-12). As part of his orientation upon his transfer to Pinckneyville, Plaintiff was examined by medical staff and received an orientation manual (*id.* at 18-20).   Plaintiff's Offender Health Status Transfer Summary noted Plaintiff suffered from asthma and ulcerative colitis (*see* Doc. 139-8 at 4).

*Medical Treatment for Hernia*

Plaintiff was seen by a nurse at Pinckneyville on March 10, 2019 complaining of pain to his right-side inguinal area (*see* Doc. 139-8 at 11).   Plaintiff reported that he had undergone surgery to the area in 1997 and at times, his pain was a 9 on a 1-10 scale (*see id.*).   The nurse did not see a visible hernia and noted that "when it is out [he] can put [it] back in himself" (*see id.*). The nurse referred Plaintiff to a physician and provided him with Ibuprofen (*see id.*).   Plaintiff saw Dr. Myers on March 14, 2019 to address his hernia (*see id.* at 13).   Plaintiff again reported he underwent a right inguinal hernia repair in 1997, and indicated that recently the hernia was protruding, but was able to be reduced (*id.*).   Plaintiff indicated the hernia caused pain most of the time (*see id.*).   Upon examination, Dr. Myers did not visualize a hernia and noted that Plaintiff had a hernia belt while he was at Dixon Correctional Center (*see id.*).   Dr. Myers prescribed Plaintiff a hernia belt in size medium for an indefinite period of time, and requested that Plaintiff return in six months for evaluation of his hernia (*see id.*).   At his deposition, Dr. Myers testified that he determined Plaintiff would be issued a hernia belt in size medium based on his visualization of Plaintiff's height and weight (Doc. 139-2 at 74-75).   Dr. Myers also explained that a reducible hernia means the protrusion can be pushed back with manipulation, and remarked that the purpose of the hernia belt is to control the hernia (*id.* at 77).

Plaintiff reported to a nurse on April 10 and April 18, 2019 that he had not received his hernia belt (*see* Doc. 139-8 at 17, 18).   A nursing note on April 25, 2019 indicates that a hernia belt was delivered to Plaintiff (*see id.* at 22).   Plaintiff advised a nurse on May 3, 2019 that he wanted to return the hernia belt because it was too small (*see id.* at 26).   The nurse advised Plaintiff to wait until he was seen by the doctor to discuss the hernia belt (*see id.*).   Plaintiff saw Dr. Myers on May 7, 2019, and Dr. Myers discontinued Plaintiff's medium hernia belt and prescribed Plaintiff a large belt (*see id.* at 28).   Plaintiff's medium hernia belt was collected (*see id.*). Plaintiff's large hernia belt was issued to him on June 26, 2019 (*see* Doc. 139-9 at 65).

On September 3, 2019, Plaintiff saw a nurse and requested a low gallery permit due to his hernia pain (*see* Doc. 139-8 at 54).   The nurse noted she spoke with Dr. Myers who advised that Plaintiff did not meet the criteria for a low gallery/low bunk permit (*see id.*).   Plaintiff saw Dr. Myers on September 4, 2019 to address his hernia complaints (*see id.* at 57-58).   In addressing Plaintiff's request for a low bunk permit and his belief he was not to engage in physical activities, Dr. Myers clarified that Plaintiff may engage in physical activity, but should avoid heavy lifting and engage in activity as tolerated (*see id.*).   Dr. Myers explained that a reducible hernia with self-reported pain does not fit the criteria for a low bunk permit (*see id.*).   Dr. Myers prescribed Tylenol 500mg be taken as needed up to three times per day for nine months (*see id.*).

Plaintiff testified that he wore his hernia belt every day after it was issued and indicated that the belt "somewhat" helped to reduce the discomfort associated with his hernia (Doc. 139-1 at 145).   Plaintiff's hernia belt was lost upon his transfer to Lawrence, but Plaintiff testified he was issued a low gallery, low bunk permit while at Lawrence (*id.*).   As of the date of Plaintiff's deposition (March 14, 2022), he had not undergone any surgical repair for his hernia (*id.* at 148). Plaintiff testified that Dr. Myers told him that Wexford would not approve surgery for his hernia

because it was reducible (*id.* at 139).

Defendant Dr. Myers testified that he did not believe surgery was medically necessary for Plaintiff's hernia (Doc. 139-2 at 154).   Dr. Neil Fisher, a Wexford 30(b)(6) representative who worked as the corporate director for utilization management, testified that Wexford has guidelines involving hernia evaluation and a potential treatment plan, but explained that the guidelines are "clinical pathways that are not necessarily applied to all patients or all clinical situations" (Doc. 139-12 at 20).   Dr. Fisher testified that it is "up to the provider and their independent medical judgment to develop a treatment plan related to that individual patient, recognizing the uniqueness of each patient's case" (*id.*).   According to Dr. Fisher, Wexford does not have a policy or practice to discourage providers from submitting off-site referrals for patients with reducible hernias (*id.* at 34).

***Medical Treatment for Ulcerative Colitis***

Plaintiff was diagnosed with ulcerative colitis in 2014 and began receiving Humira injections in 2015 or 2016 (Doc. 139-1 at 27).   Upon Plaintiff's transfer to Pinckneyville, ulcerative colitis was noted as a "chronic condition" (*see* Doc. 139-8 at 4).   Plaintiff received Humira injections on December 6, 2018, December 20, 2018, January 3, 2019, January 17, 2019, and February 14, 2019, as noted in Plaintiff's Medication Administration Record ("MAR") (*see* Doc. 139-9 at 14).

On February 19, 2019, Plaintiff was seen by a non-party nurse practitioner to address his complaints of dry skin that he asserted were related to his use of Humira (*see* Doc. 139-8 at 9). NP Dearmond prescribed various ointments to address Plaintiff's complaints of dry skin (*see id.*). NP Dearmond also prescribed Humira 40 mg/0.8mL, and noted Plaintiff should receive an injection every two weeks for six months (*see id.*).

On March 17, 2019, Plaintiff was seen by a non-party nurse complaining that he had not received his Humira injection (*see* Doc. 139-8 at 14).  The nurse noted she called over to the housing unit to have Plaintiff brought over for the injection and it was documented that he received a Humira injection on March 17, 2019 (*see id.*; *see* Doc. 139-9 at 22).

Plaintiff was seen by an outside provider specializing in gastroenterology, PA Tommie Smith, on March 26, 2019 (*see* Doc. 139-8 at 68-72).  It was noted that Plaintiff complained of fatigue, abdominal pain, blood in stool, and headaches (*see id.* at 69).  PA Smith also noted that since Plaintiff's transfer to Pinckneyville his Humira injection schedule had been altered and he was receiving an injection "at times" every four weeks (*see id.*).  PA Smith recommended that Plaintiff receive Humira injections every fourteen days to avoid the development of antibodies to Humira (*see id.* at 70).  PA Smith requested a follow-up in two months (*see id.*).  Plaintiff saw Defendant Dr. Myers on March 28, 2019 for a medical furlough as a follow-up to his gastroenterologist appointment (*see id.* at 16).  Dr. Myers noted Plaintiff was on schedule for Humira and indicated a stool sample was submitted (*see id.*).  Dr. Myers submitted a referral for Plaintiff's follow-up with the gastroenterologist (*see id.*).

Plaintiff received a Humira injection on March 31, 2019 and April 14, 2019 per his MAR (*see* Doc. 139-9 at 22).  On April 17, 2019, Dr. Myers noted Plaintiff was to receive Humira 40 mg SQ (subcutaneous injection) every two weeks for six months (*see* Doc. 138-9 at 18).  Plaintiff received a Humira injection on April 28, 2019 (*see* Doc. 139-9 at 22).  Plaintiff was seen by a nurse for complaints of diarrhea and blood in his stools on April 30, 2019 (*see* Doc. 139-8 at 24). Plaintiff self-reported that he was not receiving his Humira injections regularly (*see id.*).  Plaintiff was referred to a physician (*see id.*).  Plaintiff saw another nurse on May 4, 2019 and again questioned when his Humira injections were due (*see id.* at 27).  Plaintiff received a Humira

injection on May 5, 2019 (*see* Doc. 139-9 at 22).

On May 7, 2019, Plaintiff was seen by Dr. Myers for complaints of stomach/abdominal pain (*see* Doc. 139-8 at 28).   Plaintiff reported that he was not receiving his Humira injections as prescribed and, due to this, he was experiencing abdominal pain (*see id.*).   Dr. Myers reviewed Plaintiff's MAR and found Plaintiff was receiving his Humira treatment every two weeks (*see id.*).   Dr. Myers generally recalled discussing Plaintiff's concerns about his medication irregularities, and indicated that he discussed Plaintiff's concerns with the nursing staff (Deposition of Dr. Percy Myers, Doc. 139-2 at 67-68).

On May 10, 2019, Plaintiff was seen by a licensed practical nurse for a self-reported ulcerative colitis "flare-up" (*see* Doc. 139-8 at 31).   Plaintiff complained of pain due to his ulcerative colitis and attributed his issues to the irregularity of his Humira injections (*see id.*).   The LPN did not observe any signs of obvious discomfort and referred Plaintiff to a physician (*see id.*).   Plaintiff then saw Dr. Myers on May 15, 2019, wherein Plaintiff reiterated his complaints of abdominal pain caused by the incorrect timing of his Humira injections (*see id.* at 32).   Dr. Myers noted that the injection schedule was off, but found that it had been corrected (*see id.*).   Dr. Myers performed a rectal examination and noted that Plaintiff's stool was positive for occult blood (*see id.*).   Dr. Myers ordered a complete blood count with differential, sed rate, and CRP (*see id.*).   Dr. Myers noted that he would follow-up with Plaintiff after Plaintiff was seen by his gastroenterologist the next week (*see id.*).   Plaintiff received a Humira injection on May 19, 2019 (*see* Doc. 139-9 at 22).

Plaintiff saw PA Tommie Smith for a follow-up on May 20, 2019 (*see* Doc. 139-8 at 79-82).   PA Smith noted Plaintiff was not seeing any blood in his stool, but Plaintiff had indicated he had a rectal exam recently that was positive for blood (*see id.* at 79).   Plaintiff reported to PA

Smith that he was not receiving his Humira on schedule and indicated he received Humira on April 14, April 19, April 28, May 3, and May 5, 2019 (*see id.*).   PA Smith indicated Plaintiff was to receive Humira once every other week, and noted Plaintiff was not to have rectal exams unless symptoms of an obstruction were present (*see id.*).   PA Smith recommended a colonoscopy, endoscopy, and a follow-up in eight weeks (*see id.*).   A nurse saw Plaintiff on this same date for a medical furlough return follow-up and the nurse ordered bowel prep for Plaintiff's colonoscopy and noted that she placed referrals for the colonoscopy and endoscopy (*see id.* at 34).   Dr. Myers made a note in Plaintiff's medical record on May 21, 2019, indicating he would follow-up with Plaintiff after the endoscopy and colonoscopy were completed (*see id.* at 34).   Plaintiff received a Humira injection on June 16 and June 19, 2019 (*see* Doc. 139-9 at 22).   On June 19, 2019, Plaintiff saw Dr. Myers who noted that Plaintiff had not received a Humira shot for several weeks according to the nurse, but remarked that Plaintiff had stated he received a shot on June 16, 2019 (Doc. 139-8 at 38).   Dr. Myers also noted that Plaintiff had not received a refill for his GERD medication (*see id.*).   Dr. Myers admitted Plaintiff to the infirmary for his colonoscopy and endoscopy (*see id.*).

Plaintiff underwent a colonoscopy and endoscopy on June 20, 2019 (*see* Doc. 139-8 at 41-43; 90-93).   The colonoscopy had findings of normal colon mucosa, normal terminal ileum, edematous rectal mucosa, and internal hemorrhoids (*see id.* at 90).   The endoscopy had findings of normal esophageal mucosa with a few small gastric polyps in gastric body, and normal duodenal mucosa (*see id.* at 91).   The colonoscopy biopsies showed findings of chronic inactive colitis (*see id.* at 92).   Plaintiff saw Dr. Myers on June 20, 2019 as a follow-up to the endoscopy and colonoscopy, and noted a referral was submitted for a follow-up with Plaintiff's gastroenterologist (*see id.* at 43).   Dr. Myers saw Plaintiff again on June 21, 2019 and discharged Plaintiff from the

infirmary (*see id.* at 45).   During a chronic care clinic visit with Dr. Myers on June 25, 2019, Dr. Myers prescribed Humira 40 mg SQ every two weeks for twelve months (*see* Doc. 139-9 at 4).

Plaintiff received a Humira injection on July 2, 2019 and two Humira injections on July 16, 2019 (*see* Doc. 139-9 at 36).   With regard to the injections on July 16, 2019, Defendant RN Kelley documented that he misread the order on Plaintiff's MAR and gave Plaintiff two 40 mg/1mL shots rather than one (*see* Doc. 139-8 at 48).   RN Kelley noted that he called Dr. Myers who stated that Plaintiff would be fine and he should continue to receive a Humira shot once every two weeks and not skip the next dose (*see id.*).   RN Kelley noted that Plaintiff had left the healthcare unit before he could advise him, but that Kelley observed no signs or symptoms of acute distress of Plaintiff (*see id.*).

Plaintiff was seen by PA Smith on July 18, 2019 for a follow-up to his colonoscopy and endoscopy (*see* Doc. 139-8 at 95-97).   PA Smith indicated that Plaintiff should repeat the studies in three years or sooner if there are flare-ups (*see id.*).   Plaintiff was to continue on Humira with one injection every fourteen days (*see id.* at 97).   Plaintiff saw Dr. Myers for a medical furlough follow-up on the same date (*see id.* at 51).

Plaintiff received a Humira injection on July 30, August 13, August 27, 2019, and September 10, 2019 (*see* Doc. 139-9 at 36).   Plaintiff was transferred to Lawrence Correctional Center on September 11, 2019 (*see* Doc. 139-8 at 61).   After his transfer to Lawrence, Defendants Myers, Blaise, Kelley, Mileur, Rueter, and Anderton were no longer involved in his medical care (Doc. 139-1 at 163-64).

Plaintiff testified that when he was not getting his medication he was in "constant pain" (Doc. 139-1 at 132-33).

With regard to the administration of injection medications such as Humira, Defendant

Blaise, the Director of Nursing at Pinckneyville at all times relevant, testified that she did not provide any injections to Plaintiff (Doc. 139-5 at 44).   Defendant Blaise, however, spoke to Plaintiff after Plaintiff received Humira injections on June 16 and June 19, 2019, per Plaintiff's request (*id.* at 11).   Blaise spoke with Plaintiff about this issue and advised a plan would be documented in Plaintiff's MAR to ensure it did not happen again (*id.* at 13).   Defendant Blaise told Plaintiff to refuse an injection if they called him for an injection that was not within his schedule (*id.*).   Defendant Blaise spoke with the nurses who dispensed Plaintiff's injections on June 16 and June 19, 2019, Nurses Mileur and Rueter, and also spoke with the entirety of the nursing staff to address the issue (*id.* at 14).   Defendant Blaise advised Rueter and Mileur that they needed to follow Plaintiff's treatment plan and were advised to bring any issues with the same to Blaise's attention (*id.* at 16).   Blaise told Mileur, the nurse who dispensed Plaintiff's June 16, 2019 injection, that she needed to initial Plaintiff's MAR to document the injection (*id.* at 82).   This corrective action was taken *after* Plaintiff had already been administered another dose of Humira on June 19, 2019 (Blaise advised the staff at the staff meeting that there may be disciplinary action if Plaintiff's treatment plan was not followed (*id.* at 16).   Blaise reminded staff again during a meeting of Plaintiff's dosage regimen following Kelley's dispensation of two doses of Humira in July 2019 (*id.*5 at 20).   Blaise testified that the proper procedure is for the nurse who is going to administer medication to also sign out for the syringe (*id.* at 81).

The Needle/Syringe Log indicates syringes of Humira were "checked out" for Plaintiff on February 28, March 17, April 14, April 19, April 28, May 3, May 5, May 19, June 2, June 16, June 19, and July 2 (Doc. 144-2 at 5,7,10,12,13,14,15,16,17,20,22,23,25)

***May 15, 2019 Examination by Dr. Myers***

As mentioned previously, Plaintiff saw Dr. Myers on May 15, 2019 to address his

continuing complaints of abdominal pain that Plaintiff ascribed to receipt of Humira injections beyond the two-week prescribed schedule (*see* Doc. 139-8 at 32).   At this examination, Dr. Myers noted Plaintiff had a positive occult, which means Plaintiff's stool sample was positive for blood (*see id.*; Doc. 139-2 at 89-90).   Dr. Myers testified the notation of a "positive occult" indicates he conducted a rectal exam on this date and noted it was positive for blood (Doc. 139-2 at 91).   Dr. Myers testified there were other test options available, but he determined a rectal exam was appropriate based on its reliability and to ensure Plaintiff's safety and welfare (*id.* at 95).   Dr. Myers testified that he conducted the rectal examination because he believed it was medically necessary at the time to address Plaintiff's complaints of abdominal pain and rectal bleeding (*id.* at 108).   Dr. Myers testified he did not remember the exact words stated by Plaintiff in response to Dr. Myers' suggestion of a rectal exam, but Dr. Myers testified that if he makes such a suggestion to a patient and they are not in agreement, they may refuse (*id.* at 95).   If a patient refuses such an examination, they must sign a refusal form (*id.* at 97).   In circumstances where a person is unwilling to sign a refusal form, Dr. Myers testified that a witness will sign that the patient verbally refused and declined to sign the refusal form (*id.* at 106).   Dr. Myers testified that Plaintiff did not refuse a rectal exam on this date because if he had refused the exam, a refusal would have been signed and the rectal exam would not have been completed (*id.* at 98).

Defendant RN Anderton was present for the rectal examination (Doc. 139-7 at 11). Defendant Anderton testified that Dr. Myers requested she be a witness to the rectal exam, and explained that she was present when Dr. Myers explained to Plaintiff that he was going to conduct a rectal exam (*id.* at 11).   Dr. Myers pulled the curtain and Defendant Anderton was behind the curtain while the examination was conducted (*id.* at 12).   Defendant Anderton testified that she did not hear Dr. Myers make any noises while performing the exam, and she did not recall Plaintiff

objecting to the same (*id.*).   Immediately following the exam, Dr. Myers directed Defendant Anderton to take Plaintiff to have his labs drawn, and Anderton walked Plaintiff to the lab (*id.*).

Defendant Anderton also testified that a rectal examination is a common procedure for someone with Plaintiff's medical condition (Doc. 139-7 at 13).   Defendant Anderton explained that Plaintiff's complaint on that day was rectal bleeding and the only way to determine where the bleeding was coming from was by doing an exam (*id.*).

On May 19, 2019, Plaintiff submitted a grievance complaining that Dr. Myers sexually assaulted him during an examination on May 16, 2019[1] (*see* Doc. 151-1).   In this grievance, Plaintiff explained that he expressed concern over the timeframe in which he was receiving Humira injections and, soon after expressing his concerns, Dr. Myers called for the nurse, who stayed behind the curtain, and Dr. Myers began to put lube on his fingers and told Plaintiff he was going to do a "test."   In this grievance, Plaintiff asserts he explained to Dr. Myers that he was diagnosed with ulcerative colitis, and that he was seeing a specialist who recommended that his stool be sampled by a lab (*id.*).   Despite Plaintiff's protests, he writes that Dr. Myers told him to pull down his pants and Dr. Myers placed his hand on his back "in a way" to force him down and placed his finger in Plaintiff's anus "while making a grunting sound" (*id.*).   Plaintiff explains that when he "rose" up, Dr. Myers laughed and told him he tested positive for blood (*id.*).   Plaintiff complains in this grievance that the rectal exam was sexually motivated and meant to demean and humiliate Plaintiff because he has ulcerative colitis, a symptom of which is blood in the stool that is to be monitored by a blood test every 90 days and, as such, Plaintiff contends the rectal exam served no

---

[1] The Court notes the discrepancy between Plaintiff's medical records, which indicate he saw Dr. Myers on May 15, 2019 and Plaintiff's grievance, which indicates he saw Dr. Myers on May 16, 2019.   The Court will refer to the examination date at issue as May 15, 2019 per the medical records, but finds this discrepancy is not material to the issues before the Court.

purpose (*id.*).

Plaintiff's deposition testimony concerning this incident mirrors that of the grievance. More specifically, Plaintiff testified that he saw Dr. Myers in May 2019 and explained that his medication was being mismanaged (Doc. 139-1 at 150).   According to Plaintiff's testimony, Dr. Myers began pulling on gloves and told Plaintiff he was going to conduct a rectal exam (*id.*). Plaintiff questioned why he was being given a rectal exam in light of his ulcerative colitis diagnosis (*id.*).   Plaintiff told Dr. Myers bleeding is a symptom of his ulcerative colitis and his bleeding is to be monitored through stool samples (*id.* at 151).   Plaintiff testified that despite his advisements, Dr. Myers insisted on completing the rectal exam (*id.*).   Dr. Myers called in the nurse and then slid the curtain around him and Plaintiff (*id.*).   The nurse was on the other side of the curtain and could not see Plaintiff and Dr. Myers (*id.* at 152).   Plaintiff testified that he "shouldn't [have] went along with that procedure," and asserted that Dr. Myers proceeded to put his hand on Plaintiff's back, put his finger in Plaintiff's anus, and make a grunting sound (*id.* at 151).   Plaintiff testified that he believes the rectal exam was done in retaliation because Dr. Myers appeared frustrated with Plaintiff's complaints that he was not receiving his medication (*id.* at 153).   Plaintiff also testified that he did not refuse the rectal exam by Dr. Myers because he did not want his treatment to be "taken away" (Doc. 139-1 at 155).

### *Response to Plaintiff's Complaints Concerning May 15, 2019 Examination by Dr. Myers*

Following the May 15, 2019 examination with Dr. Myers and the alleged sexual assault, Plaintiff filed a complaint pursuant to the Prison Rape Elimination Act ("PREA") (Doc. 139-1 at 36).   Defendant Lt. Frank with Internal Affairs conducted the investigation into Plaintiff's complaint (Doc. 143-6 at 59-60).   Plaintiff was interviewed by Defendant Lt. Frank regarding his complaint (*id.*).   Defendants Anderton, Myers, Rueter, Mileur and Kelley were also interviewed

as part of the investigation (*see* Doc. 143-7 at 1).   Defendant Frank testified that this specific investigation was not "by definition" a PREA complaint because there was no sexual motivation or action that took place (Doc. 143-6 at 64, 81).   Rather, Defendant Frank asserted Dr. Myers performed a routine medical exam and, according to Frank, medical procedures are not a Prison Rape Elimination Act issue (*id.*).   Defendant Frank testified he came to the conclusion that the incident was a medical procedure and not an assault based on Plaintiff's statement, Dr. Myers' statement, Danielle Anderton's statement, Plaintiff's previous exams that were done in the same manner, Plaintiff's previous refusal to have such exams, and Plaintiff's documented medical issue (*id.* at 65).

In Lt. Frank's Report of Investigation concerning the alleged sexual assault, it is noted that Plaintiff stated the rectal exam performed by Dr. Myers was sexually motivated and done for a retaliatory purpose (Doc. 151-3 at 3).   Plaintiff ascribes this same motivation to Dr. Myers' actions in his letter to the Illinois State Police dated May 20, 2019 (*see id.* at 16-17).   At his deposition, Plaintiff testified he believed Dr. Myers performed the rectal examination out of retaliation because Dr. Myers seemed "frustrated" about Plaintiff's constant complaints that he was not receiving his medication (Doc. 139-1 at 153).   The Internal Affairs investigation concluded the following, "Based on the lack of direct evidence, inconsistent information provided by DAVIS, the fact that DAVIS knew he could refuse the medical procedure, the fact that the medical procedure was reasonable for DAVIS' medical condition, and the fact the allegation made by DAVIS was not witnessed by other staff members or reported by credible confidential informants, the allegation Medical Director PERCY C. MYERS sexually abused DAVIS is unfounded."   Defendant Lt. Frank testified that when an investigation finding is "unfounded," it means the evidence "says that it didn't happen" (Doc. 143-6 at 63).

Pursuant to Administrative Directive 04.01.301(II)(G)(4)(c), regarding "Sexual Abuse and Harassment Prevention and Intervention Program," that was active at the time of the May 15, 2019 examination, any offender who alleges to be a victim of sexual harassment shall be: (1) offered protection from the alleged harasser and the incident shall be investigated; and (2) offered counseling and supportive services (*see* Doc. 150-2 at 9).   Defendant Frank testified that for AD 04.01.301(II)(G)(4)(c) to be operative regarding "offered protection," there needs to be some evidence of an actual complaint that falls under the purview of PREA, and Defendant Frank testified this was not the case in this instance (Doc. 143-6 at 87).

***Plaintiff's Complaints Regarding Treatment of Ulcerative Colitis and Administration of Medication***

While Defendant Frank interviewed Plaintiff regarding his PREA complaint in May 2019, Plaintiff also explained his medication issues (Doc. 139-1 at 61).   More specifically, Plaintiff testified that he told Defendant Frank that the dates he was receiving his Humira injections were not "adding up" (*id.* at 62).

In Defendant Frank's Investigation Report dated May 16, 2019 (Doc. 151-3), Frank found that Plaintiff's MAR failed to reflect that Plaintiff had received an injection on June 16, 2019 (*id.* at 8).   Defendant Frank also determined that Plaintiff was given two shots of 40 mg of Humira on July 16, 2019, in contravention of the medical order for a single 40 mg dose (*id.* at 5).   Defendant Frank included the following conclusions regarding Plaintiff's medication administration (*id.* at 8):

> Based on direct evidence, it has been substantiated that multiple medication errors and Grievance Response errors were made due to DAVIS' Medication Administration Record (MAR) not being properly documented. This investigation could not determine all the accountable individuals due to the fact the Registered Nurse on duty is responsible for issuing syringes and documenting the issuance on the Needle/Syringe Log for accountability

and inventory purposes, but the injection can be administered by any nursing staff. The administering Nurse is responsible for documenting the MAR. HCUA BROWN and DON BLAISE have implemented corrective action and monitoring.

DAVIS was submitted for a Lateral Transfer due to multiple medical errors in the schedule and dosage of DAVIS' prescribed medication.

Consistent with the Report's conclusions, Defendant Frank testified that he submitted a recommendation to the warden's office for Plaintiff to be transferred due to "multiple medical errors" (Doc. 143-6 at 35-36).   Defendant Frank testified that he found several errors in the scheduling of shots for Plaintiff, found instances wherein Plaintiff had received the incorrect dosage, and found that even after corrective action was supposed to be taken the errors continued (*id.* at 36).   Due to the record of medication errors, Defendant Frank testified that he recommended Plaintiff for a lateral transfer, meaning Plaintiff's security levels would remain the same and he would be transferred to another medium security facility (*id.* at 38).   As the Warden of Pinckneyville, Defendant Thompson received an email dated August 20, 2019 from Defendant Frank regarding Plaintiff's lateral transfer (Doc. 143-8 at 6).

Plaintiff testified that Defendant Lt. Frank and Warden Thompson recommended and signed off on his transfer from Pinckneyville with an increase in his security level for a retaliatory purpose (Doc. 139-1 at 85-86).   Plaintiff never spoke with Defendant Thompson directly about being transferred (*id.*).   However, Plaintiff testified he believed Defendant Thompson was "aware" of the whole situation and signed off on an increase in Plaintiff's security level without justification (*id.*).   Defendant Thompson testified that the counselors with the Clinical Services Department review inmates' security designations when a transfer is submitted and he would sign off on the same as part of the transfer (Doc. 143-4 at 8).   Defendant Thompson indicated he has no specific recollection of approving a change to Plaintiff's security status while he was housed at

Pinckneyville; however, Thompson testified that he approved the transfer that would have included any change to Plaintiff's security status (Doc. 143-3 at 17).   The final decision on transfers is made by the Transfer Coordinator's Office in Springfield, Illinois (Doc. 143-6 at 34). At the time of Plaintiff's transfer from Pinckneyville to Lawrence both facilities were medium level security institutions (Doc. 139-1 at 13; Doc. 143-6 at 43).

Plaintiff also complained about his medical treatment to Defendant Dr. Sylvia Lane.   More specifically, Defendant Lane, the Psychologist Administrator at Pinckneyville at all times relevant, discussed Plaintiff's concerns regarding overmedication, submission of grievances, and fear of not being treated during a mental health session on May 20, 2019 (Doc. 143-2 at 54-55).   Following this mental health session, Defendant Lane spoke with Defendant Christine Brown, the Healthcare Unit Administrator, regarding Plaintiff's case (*id.* at 58).   Brown and Lane reviewed Plaintiff's file and found that Plaintiff had received his medication more frequently than prescribed on one or two occasions (*id.* at 59).   They also discussed Plaintiff's concerns regarding the rectal exam and Brown advised that she would go to Plaintiff's doctor's appointments with him (*id.* at 59). Defendant Dr. Lane also spoke with Defendant Blaise and they reviewed Plaintiff's MAR together and came to the conclusion that Plaintiff had received his medication early and that the issue had been corrected (*id.* at 65).

Defendant Lane met with Plaintiff for another mental health session on May 28, 2019, and he discussed being a "target" because he submitted grievances (Doc. 143-2 at 71, 74).   Plaintiff reiterated that he was receiving his Humira shots too close together (*id.* at 71).   Plaintiff saw Defendant Lane again on July 23, 2019 and indicated he wanted to be transferred out of Pinckneyville (*id.* at 76-77).   Defendant Lane sent an email to Defendant Lt. Frank regarding Plaintiff's request for a transfer on August 7, 2019 (*see* Doc. 143-8).

Defendant Brown testified that she informed Plaintiff that he could request that she be present during his medical appointments if no medical provider besides Dr. Myers was available (Doc. 143-3 at 63).   Defendant Brown also discussed this with Dr. Myers and Dr. Lane (*id.* at 64). Defendant Brown testified that she was called to attend an appointment with Plaintiff on at least one occasion, but could not remember the issue that was addressed or whether an examination of Plaintiff by Dr. Myers actually occurred (*id.*).

Plaintiff also filed multiple grievances between March and July 2019 complaining that he was not receiving his Humira injections as prescribed.   These grievances were dated March 14, April 18, April 23, April 30, May 3, May 5, June 22, and July 16, 2019 (*see* Doc. 144-2 at 29-54). In response to Plaintiff's March 14, 2019 grievance, the Grievance Officer responded that per DON Blaise, "Humira was received on 3/17/19. The next dose is scheduled for 3/31/19" (*id.* at 47).   Plaintiff was advised that if he had any further issues with his medication that he should contact the DON directly (*id.*).   In response to Plaintiff's April 23, 2019, and April 30, 2019 grievances, the Grievance Officer advised that "per HCUA," Plaintiff received Humira injections on 3/17, 3/31, 4/14, 4/28, and 5/5.   The HCUA indicated that Plaintiff "has received his medication timely" (*id.* at 48).   Plaintiff was advised to let security know if there was another instance when he was not called to the HCU for an injection and he could be escorted over for the same (*id.*).

### *Request for Medical Attention on June 19, 2019*

Plaintiff alleges he advised Defendant Officer Jurkowski on June 19, 2019 that he needed medical care by pressing his emergency button around 3:00 a.m. (Doc. 139-1 at 79, 83-84). Plaintiff testified that Defendant Jurkowski knew Plaintiff was experiencing pain from his gastroesophageal reflux disease ("GERD"), and instead of allowing Plaintiff to seek medical

attention, Jurkowski denied Plaintiff access to medical care and ignored Plaintiff's repeated complaints (Doc. 139-1 at 81-83).   Plaintiff testified that in response to his complaints, Defendant Jurkowski should have informed the nurse (Doc. 139-1 at 83).   Plaintiff was taken to the gym around 9:00 a.m. on the gym line, and another officer was informed of Plaintiff's condition. Plaintiff was then taken and admitted to the healthcare unit (Doc. 139-1 at 82-83).   While in the healthcare unit, Plaintiff advised Defendant Nurse Rueter about his pain and she told Plaintiff he was due for a Humira shot and, despite Plaintiff's advisement that he had received a shot a few days ago, she proceeded to administer the shot (Doc. 139-1 at 112-13; *see* Doc. 139-9 at 22).

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).   The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.   *Celotex*, 477 U.S. at 323.   Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).   In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.   *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

As a preliminary matter, in his summary judgment briefing, Plaintiff indicates he seeks to voluntarily dismiss the following claims without prejudice: Count One against Dr. Myers; Count Four against Dr. Reddling, Brown, and Lane; Count Six against Brown; and Count Seven against Wexford Health Sources, Inc.

Defendants Myers, Kelley, Mileur, Blaise, Rueter, Anderton, and Wexford ("the Wexford Defendants") requested in their reply to Plaintiff's response to their motion for summary judgment that any dismissal be with prejudice as they have endured a lengthy and costly discovery process and, they contend dismissal without prejudice would unfairly prejudice them by allowing Plaintiff to bring these claims again at a later date. The IDOC Defendants did not indicate any objection; however, Plaintiff's request for voluntary dismissal was only included in response to IDOC Defendants' motion for summary judgment. The Court is not inclined to dismiss claims without prejudice without a motion being filed and properly briefed when Defendants have already filed a motion for summary judgment.

The Court also notes that it is the plaintiff's burden to demonstrate that dismissal without prejudice is warranted and that the defendant will not suffer legal prejudice. *Mallory v. Rush Univ. Med. Center*, No. 18-C-4364, 2020 WL 6559155, at *3 (N.D. Ill. Nov. 9, 2020) (citing *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 177-78 (7th Cir. 1994) (other citation omitted). Without such a showing, the court "shall not" dismiss the action. *Id.* Here, Plaintiff makes no argument that Defendants will not suffer legal prejudice and, as such, the Court cannot dismiss these claims without prejudice – particularly over Wexford Defendants' objection and no indication of any agreement by IDOC Defendants. As Defendants have moved for summary judgment on these claims and Plaintiff had the opportunity to brief the same, the Court will determine whether summary judgment is warranted on these claims based on the record before it under Federal Rule

of Civil Procedure 56.

***Counts One and Seven – Eighth Amendment deliberate indifference claims against Dr. Myers and Wexford concerning Plaintiff's hernia***

In his First Amendment Complaint, Plaintiff alleges Dr. Myers was deliberately indifferent in treating Plaintiff's inguinal hernia (Doc. 47 at 4).   Plaintiff also alleges that Wexford created written or unwritten policies that caused him to be denied or receive delayed medical care. Plaintiff further asserts Wexford would not approve surgery for his hernia.

The Supreme Court recognizes that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment.   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).   In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind."   *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference.   "Deliberate indifference to serious medical needs of

prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

Defendant Dr. Myers and Wexford first contend that a reducible inguinal hernia is not an objectively serious medical need. In support of this contention, Defendants cite to three district court cases, including one in this Circuit, in which a court found that a plaintiff's hernia was not a serious medical need. *See Johnson v. Pfister*, Case No. 14-cv-1106-JES, 2017 WL 302634, at *3 (C.D. Ill. July 17, 2017) ("This Court finds that Plaintiff's reducible hernia is not an objectively serious medical need. Multiple medical professionals examined Plaintiff and did not find any signs of a hernia."); *Jones v. Schmidt*, Civil Action No. 13-685-JJB-RLB, 2014 WL 6772493, at *4 (M.D. La. Dec. 1, 2014) (citing another case for the proposition that "courts have often found that a failure to undertake surgical intervention for a reducible hernia is not deliberate indifference to a serious medical need"; this citation, however, does not support the proposition that a reducible hernia is not a serious medical need); and *Williams v. First Correctional Medical*, 377 F.Supp.2d

473, 476 (D. Del. July 19, 2005) (the court found no serious medical need when the defendant physician attested that the plaintiff's hernia was "very small," "reducible," and that the plaintiff had not shown any signs of complications.).   While recognizing there have been instances wherein a court has found a hernia does not constitute a serious medical need, the Court finds the record does not support such a finding in this instance at this stage in the proceedings.   While there is evidence that Plaintiff's inguinal hernia was reducible, there is also evidence that it caused him pain and he regularly sought treatment for the same.   It is also apparent from the record that Plaintiff's hernia required regular medical follow-up.   Thus, the Court cannot find that Plaintiff's inguinal hernia was not a serious medical need.

The Court's inquiry on Counts One and Seven does not end, however.   Indeed, the Court must determine whether Dr. Myers was deliberately indifferent in treating Plaintiff's hernia and whether Wexford implemented a policy or procedure that caused Plaintiff to receive inadequate medical treatment for the same.

### Dr. Percy Myers

The record before the Court establishes that Dr. Myers first saw Plaintiff to address his hernia condition on March 14, 2019.   Plaintiff indicated his hernia was able to be reduced, and Dr. Myers was not able to visualize the same.   Dr. Myers prescribed Plaintiff a hernia belt during this examination, and Plaintiff was ultimately issued a well-fitting hernia belt in June 2019. Plaintiff saw Dr. Myers on September 4, 2019 to address his complaints related to his hernia.   At this examination, Dr. Myers prescribed pain relievers for Plaintiff and clarified that he should avoid heavy lifting.   Plaintiff testified that his hernia belt reduced the discomfort associated with his hernia.

The Court finds that no reasonable jury could find that Dr. Myers' treatment of Plaintiff's

condition evidenced deliberate indifference.   Dr. Myers saw Plaintiff three times to address his hernia complaints over a relatively brief six-month period.   During this time, Dr. Myers prescribed Plaintiff pain relievers and issued Plaintiff a hernia belt.   There is no evidence in the record that Plaintiff's hernia required more aggressive treatment, as it appears Plaintiff's hernia was reducible and his discomfort associated with the same was managed with a hernia belt.   The Eighth Amendment does not require that prisoners receive "unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see also Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [the plaintiff] is not entitled to demand specific care"). Also, the Seventh Circuit recognizes that treatment decisions that necessarily require medical judgment, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview.   *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (citation and quotation omitted).   Here, it is apparent that Dr. Myers employed his medical judgment in treating Plaintiff's hernia and had determined that surgery was not necessary to treat the same.   Based on the record before the Court, no reasonable jury could find that Dr. Myers' treatment of Plaintiff's inguinal hernia reflected deliberate indifference to his condition.

For these reasons, Dr. Myers is entitled to summary judgment on Count One.

**Wexford Health Sources, Inc.**

Where a private corporation has contracted to provide essential government services, such as health care for prisoners, the private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself.   *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014); *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).   Accordingly, in order for Plaintiff to recover from Wexford, he must offer evidence that an injury was caused by a

Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Shields*, 746 F.3d at 796. Plaintiff must also show that policymakers were aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009). Finally, a policy or practice "must be the 'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted).

Plaintiff alleges Defendant Wexford violated his Eighth Amendment rights in implementing policies that caused him to receive inadequate medical care for his hernia. Defendant Wexford asserts summary judgment in its favor is warranted on this claim because Plaintiff cannot demonstrate that there was an "official policy, widespread custom, or action by an official with policy-making authority" by Wexford that was the "moving force" behind Plaintiff's constitutional injury. The Court agrees.

Plaintiff testified that Dr. Myers indicated Wexford would not approve surgery for his hernia because it was reducible. Dr. Myers testified that he did not believe surgery was necessary for Plaintiff's hernia, and Dr. Fisher testified that its providers may use their independent medical judgment to treat a patient. Here, the evidence establishes that Dr. Myers evaluated Plaintiff's hernia and determined the appropriate course of treatment was a hernia belt and pain medication. Dr. Myers did not believe surgery was necessary. There is no indication these treatment decisions were deliberately indifferent, or that any medically necessary treatment, including surgery, was avoided due to any Wexford policy or practice. For these reasons, Wexford Health Sources, Inc. is entitled to summary judgment on Count Seven.

***Count Two – Eighth Amendment claim against Dr. Myers related to Plaintiff's allegations of sexual assault***

"An unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the force exerted by the assailant is significant." *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012) (citations omitted).   In a case wherein the plaintiff alleged that a doctor at his correctional facility "put his hand in the back of [the plaintiff's] pants and pull[ed] the plaintiff toward [the defendant physician] and touch[ed] [the plaintiff's] buttock in a kneading motion using his hand and fingertips … for about 30 to 40 seconds," the court found that the touching could have been a legitimate medical examination, but because the plaintiff alleged the defendant physician was acting out of sexual desire, he stated a claim under the Eighth Amendment. *Robertson v. Barth*, No. 3:14-CV-688-JD, 2014 WL 2572831, at *1 (N.D. Ind. June 6, 2014).

The circumstances here are similar.   Plaintiff alleges Defendant Dr. Myers subjected him to an unnecessary rectal examination despite Plaintiff voicing concerns about the same, and that the examination was sexually motivated and done out of retaliation.   Dr. Myers asserts the rectal examination would not have been done if Plaintiff refused.   Dr. Myers also asserts the examination was medically necessary based on Plaintiff's complaints.

This is clearly an instance wherein there is a genuine issue of disputed fact.   Any reference to the Internal Affairs report and findings or the deposition testimony of Defendant Anderton does not resolve the disputes in the record.   While the parties do not dispute that a rectal examination of Plaintiff occurred — the motivation, medical necessity, and intent of the examination are clearly disputed and material to Plaintiff's claim.   It is for the factfinder, not this Court on a motion for summary judgment, to resolve the credibility issues inherent to this claim.   Therefore, summary

judgment on Count Two must be denied.

***Count Three – First Amendment retaliation claim against Dr. Myers***

In Count Three, Plaintiff alleges Dr. Myers sexually assaulted him in retaliation for Plaintiff complaining about his medical treatment and filing grievances concerning the same.

A prison official who takes action in retaliation for a prisoner's exercise of a constitutional right violates the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). The Seventh Circuit has articulated that for a plaintiff to prevail on a First Amendment retaliation claim, he must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendant's decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)) (other citations omitted).

At the summary judgment stage, the Seventh Circuit has held that the burden of proving causation is split between the parties. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). Initially, in order to establish a prima facie case, the plaintiff must produce evidence that his speech was at least a "motivating" factor in the defendant's decision to take retaliatory action. *Id.* Then, the burden shifts to the defendant to rebut the causal inference raised by the plaintiff's evidence and show that the harm would have occurred anyway, despite the protected activity. *Id.* If the defendant fails to counter the plaintiff's evidence, then the defendant's retaliatory actions are considered a "necessary condition" of the plaintiff's harm, and the plaintiff has established the "but-for" causation needed to succeed on his claim. *Id.*

Defendant Myers does not argue that Plaintiff failed to meet the first and second requirements — that Plaintiff engaged in activity protected by the First Amendment and that

Page **27** of **45**

Plaintiff suffered a deprivation that would likely deter future First Amendment activity.   As such, the Court considers these issues conceded for purposes of summary judgment.   Defendant Myers, however, contends that Plaintiff has not shown that the rectal examination at issue was motivated by retaliation in response to Plaintiff's complaints and grievances concerning his medical treatment.

Plaintiff's burden in establishing a prima facie case may be met by presenting either direct or circumstantial evidence.   *Kidwell*, 679 F.3d at 965.   Direct evidence is evidence which will prove a particular fact without reliance upon inference or presumption, while circumstantial evidence is evidence from which a trier of fact may infer that retaliation occurred, including suspicious timing or ambiguous oral or written statements.   *Id.* (quotations and citations omitted).

Here, in order to establish causation, Plaintiff must produce evidence that his speech was a "motivating factor" in Dr. Myers' decision to perform the May 15, 2019 rectal examination. Plaintiff asserts this requirement is met insofar as Dr. Myers performed the rectal examination immediately after Plaintiff complained that he was not receiving his ulcerative colitis medication at the required intervals.   Plaintiff also relies on his testimony that Dr. Myers appeared frustrated about these complaints just prior to performing the rectal exam.   Finally, Plaintiff points to a grievance he filed on May 5, 2019, wherein Plaintiff complained about his medication issues and medical treatment (*see* Doc. 151-4).   This grievance was submitted as an emergency grievance and the Chief Administrative Officer indicated receipt of this grievance on May 20, 2019 and, on this same date, expedited review of the grievance.   There is no evidence that this grievance was received or reviewed by any staff member in the healthcare unit, including Dr. Myers, prior to Plaintiff's May 15, 2019 rectal examination.

The evidence before the Court is not sufficient to establish that Plaintiff's filing of grievances and oral complaints concerning his medical treatment was a motivating factor in Defendant Myers' decision to conduct a rectal examination on May 15, 2019.   At most, it appears Plaintiff is relying on the general timing of the events to establish his prima facie case.   The Seventh Circuit has held that a plaintiff's reliance on suspicious timing to establish a prima facie retaliation claim will "rarely be sufficient in and of itself to create a triable issue."   *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (citations omitted).   The timing of Dr. Myers' alleged retaliatory conduct is insufficient to preclude summary judgment.   Indeed, Plaintiff "must produce evidence that somehow tie[s] the adverse [action] to [his] protected actions. The fact that one event preceded another does nothing to prove the first event caused the second."   *Dace v. Smith-Vasquez*, 658 F.Supp.2d 865, 881 (S.D. Ill. Sept. 8, 2009).   There is nothing in the record aside from Plaintiff's testimony that Dr. Myers seemed "frustrated" with his complaints to ascribe any retaliatory motive to Dr. Myers, and the Court cannot find that this is a sufficient "tie" between Plaintiff's complaints regarding his medical treatment and the rectal examination.

Notably, even if the mere timing of events was sufficient for Plaintiff to establish that Dr. Myers' rectal examination was motivated by retaliation, the record rebuts such evidence.   Indeed, both Dr. Myers and Defendant Nurse Anderton testified that the rectal examination was appropriate under the circumstances given Plaintiff's complaints of abdominal pain and rectal bleeding.   Thus, it appears that even despite Plaintiff's complaints concerning the dispensation of his medication, Dr. Myers would have performed a rectal examination on Plaintiff.

For these reasons, the Court finds Plaintiff has not met his burden to establish that Dr. Myers' actions were retaliatory, and Dr. Myers is entitled to summary judgment on Count Three.

Page **29** of 45

***Count Four – Eighth Amendment failure to protect claim against Lt. Frank, Brown, and Dr. Lane***

In Count Four, Plaintiff alleges Defendants Frank, Brown, and Lane failed to protect him from the risk of another sexual assault by Dr. Myers.   More specifically, Plaintiff alleges these Defendants were aware of his allegations against Dr. Myers, made assurances that he would be protected, but failed to ensure that Plaintiff would no longer be treated by Dr. Myers.

Although the Constitution "does not mandate comfortable prisons," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)), it does not permit inhumane ones.   *Farmer*, 511 U.S. at 832.   "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners."   *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)).   Similarly, the Eighth Amendment imposes duties on prison officials who must provide humane conditions of confinement and must "take reasonable measures to guarantee the safety of inmates."   *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).   In order to state a Section 1983 claim against prison officials for failure to protect, a plaintiff must establish: (1) that he was "incarcerated under conditions posing a substantial risk of serious harm" and (2) that the defendants acted with "deliberate indifference" to his health or safety.   *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 834)).

To satisfy the first prong, a plaintiff must show that he not only experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that the serious harm might actually occur.   *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005).   Ultimately, the question is whether the plaintiff was exposed to a sufficiently substantial risk of serious damage to his future health."   *Id.*

Here, Plaintiff makes no argument that Defendants Brown and Lane failed to protect Plaintiff from exposure to Defendant Dr. Myers.   The Court further finds that the record before it evidences that these Defendants responded to Plaintiff's allegations of sexual assault against Dr. Myers — with Dr. Lane speaking with HCUA Brown, and Brown indicating she would advise Plaintiff she would attend any examinations Plaintiff had with Dr. Myers upon request.   These actions are sufficient to establish that Defendants Lane and Brown did not act with deliberate indifference to Plaintiff's concerns regarding Dr. Myers.

Defendant Lt. Frank asserts he was not deliberately indifferent in responding to Plaintiff's concerns regarding Dr. Myers because he recommended that Plaintiff be transferred despite the fact that Frank's investigation into Plaintiff's complaints regarding Dr. Myers were determined to be unfounded.   Plaintiff asserts that Lt. Frank's recommendation for a transfer is insufficient, and asserts that Defendant Frank failed to conduct an adequate investigation into Plaintiff's claims. Plaintiff further asserts that Defendant Frank never considered Plaintiff to have made a claim of sexual assault based on Frank's understanding that the actions at issue were a medical procedure and, in refusing to characterize Plaintiff's complaint as a PREA complaint, Lt. Frank knew that Plaintiff was not offered protection from the alleged harasser.

The Court disagrees.   Based on the record before the Court, it appears Defendant Frank engaged in an investigation to address Plaintiff's complaints against Dr. Myers.   It is certainly not deliberate indifference for Defendant Frank to come to the conclusion that Plaintiff's claims were unfounded.   Indeed, Defendant Frank's report evidences the efforts he underwent to interview multiple persons in conducting his investigation and in reaching his conclusion.   While the outcome of the investigation may not have been what Plaintiff wanted, Defendant Lt. Frank did not act with deliberate indifference to Plaintiff's complaints.   Moreover, the record is devoid of

any evidence demonstrating that Plaintiff experienced any cognizable harm related to Defendant Frank's actions, or in this instance, alleged inaction.   Indeed, there is no evidence in the record that Dr. Myers allegedly engaged in any further inappropriate behavior or that Plaintiff suffered any articulable psychological harm.   *See Jackson v. Jackson*, No. 20-2705, 2021 WL 4955615, at *2 (7th Cir. 2021) (upholding the district court's entry of summary judgment in favor of the defendants based on the fact there was no evidence of any cognizable harm suffered by the plaintiff as the plaintiff was not attacked after he was denied protective custody by the defendants and the plaintiff provided no evidence he suffered any psychological harm as a result of being denied protective custody.).

For these reasons, Defendants Lt. Frank, Brown, and Dr. Lane are granted summary judgment as to Count Four.

### Count Five – Eighth Amendment deliberate indifference claim against Dr. Myers, Brown, Blaise, Kelley, Mileur Rueter, and Anderton

Plaintiff alleges Defendants Dr. Myers, HCUA Christine Brown, DON Blaise, RN Kelley, LPN Mileur, RN Rueter, and RN Anderton were deliberate indifferent in administering treatment for Plaintiff's ulcerative colitis.

Defendants and Plaintiff seek summary judgment on this claim.   In support of his motion for summary judgment on Count Five, Plaintiff asserts each of the Defendants named in this Count were aware of his ulcerative colitis and the need for proper administration of Humira to treat this condition, and that each of these Defendants acted with deliberate indifference to this serious medical need, resulting in physical and emotional harm.   Defendants contend they acted appropriately in rendering treatment for Plaintiff's ulcerative colitis.

As stated above, in order to prevail on a claim of deliberate indifference under the Eighth Amendment, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

No party has argued that Plaintiff's ulcerative colitis is not a serious medical need and, as such, the Court considers this issue conceded for purposes of summary judgment.

The Court must next consider whether there is sufficient evidence in the record for a reasonable jury to find that any defendant named in Count Five acted with deliberate indifference toward Plaintiff's treatment for his ulcerative colitis.

Relevant to this claim, it is undisputed that Plaintiff was prescribed Humira injections that were to be dispensed every fourteen days. Beyond this, the Court finds it difficult to determine exactly when Plaintiff received Humira injections. Plaintiff's Medication Administration Record (MAR) indicates he received injections on the following dates: December 6 and December 20, 2018, January 3, January 17, February 14, March 17, March 31, April 14, April 28, May 5, May 19, June 16, June 19, July 2, July 16 (two doses), July 30, August 13, August 27, and September 10, 2019. The parties do not dispute these records. According to Plaintiff's prescription, this schedule of Humira administration resulted in three missed doses, one instance in which doses were administered within a three-day period (June 16 and June 19), and one instance in which Plaintiff was provided a double dose.

The applicable Needle/Syringe Log for Pinckneyville indicates the following Humira syringes were checked out and logged for Plaintiff on the following dates: February 26, March 17, April 14, April 19, April 28, May 3, May 5, June 16, June 19, and July 2. This is also not disputed. While many of these dates correspond to the dates entered in Plaintiff's MAR, many do not,

including February 26, April 19, and May 3.   Additionally, many dates are included on Plaintiff's MAR that are not included in the syringe log, including December 6 and 20, 2018, January 3, January 17, February 14, March 31, May 19, July 16, July 30, August 13, August 27, and September 10, 2019.

Based on this record, it is impossible for the Court to determine exactly how many doses of Humira were missed or provided beyond the applicable schedule.   It is apparent, however, that Plaintiff complained to various medical providers, including Dr. Myers, that his Humira medication was not being given at the prescribed times and that issues with his medication were exacerbating his ulcerative colitis.   PA Smith, Plaintiff's outside specialist for gastroenterology, advised that Plaintiff must receive his Humira injections on schedule to avoid the development of antibodies to Humira.

As the following discussion will detail, the Court finds this is an instance wherein no one medical provider acted with deliberate indifference to Plaintiff's ulcerative colitis.   However, the Court recognizes there were notable issues with the administration of Plaintiff's medication for treatment of this condition.   This appears to be a situation wherein each individual identified in Count Five acted below the deliberate indifference threshold, but only because Plaintiff's treatment was diffused amongst many individuals whose responsibility for his overall treatment and medication regimen was not entirely clear.   *See Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 378 (7th Cir. 2017) (finding that although an unusual, an organization might be liable even if its individual agents are not. "Without the full picture, each person might think that her decisions were an appropriate response to a problem; her failure to situate care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent.").

**Dr. Percy Myers**

The record before the Court establishes that Dr. Myers saw Plaintiff to address his ulcerative colitis on March 28, May 7, May 15, June 20, and July 18, 2019.   On May 7 and May 15, 2019, Plaintiff set forth his issues with the timing of his Humira injections.   Dr. Myers reviewed Plaintiff's MAR and found there had been past discrepancies in the dispensation of Humira outside of the fourteen-day schedule.   Dr. Myers found that the schedule of injections had been corrected.   Dr. Myers also discussed Plaintiff's concerns with the nursing staff.   Finally, with regard to the dispensation of two doses of Humira on July 16, 2019, evidence indicates that Dr. Myers was notified of the issue and determined Plaintiff would be fine and should continue receiving Humira injections as prescribed.

First, the Court notes that Dr. Myers' prescribed treatment regimen of Humira injections once every fourteen days to treat Plaintiff's ulcerative colitis was not deliberately indifferent. Plaintiff makes no claim to the same, and this is also the treatment approach prescribed by PA Smith.   The issue before the Court is the misadministration of Plaintiff's Humira and Dr. Myers' actions regarding the same.   There is no evidence that Dr. Myers was charged with the administration of any Humira injection.   Indeed, the record before the Court is devoid of any indication that Dr. Myers was ever responsible for dispensing an injection.   Plaintiff informed Dr. Myers of the misadministration of his Humira, and Dr. Myers reviewed the Medication Administration Record and discussed Plaintiff's issues with the nursing staff.   Dr. Myers also found that issues with dispensation were corrected by the time Plaintiff made his complaints.

Based on this record, no reasonable jury could find Dr. Myers acted with deliberate indifference to Plaintiff's treatment regimen for his ulcerative colitis.   Dr. Myers prescribed an adequate treatment regimen and, when he was advised of issues with the same, he engaged in

Page **35** of **45**

reasonable follow-up.   For these reasons, there is no evidence Dr. Myers acted with deliberate indifference to Plaintiff's treatment for his ulcerative colitis.   Dr. Myers is entitled to summary judgment as to Count Five.

**Christine Brown**

The record establishes that Christine Brown, as the Healthcare Unit Administrator, had limited involvement in Plaintiff's medical treatment.   Indeed, Brown testified that she is not responsible for administering medications to inmates and is not a supervisor of the staff members who provide medical care or administer medications to inmates (Doc. 143-3 at 92-93).   However, Brown did provide a response to the Grievance Officer regarding Plaintiff's April 2019 grievances indicating Plaintiff received Humira injections on 3/17, 3/31, 4/14, 4/28, and 5/5, and asserting that Plaintiff had received his medications timely.   This is clearly incorrect as the timeframe from the 4/28 injection and 5/5 injection is clearly not 14 days.   Plaintiff asserts Brown's indication that Plaintiff had received his medication in a timely manner in response to this grievance contradicts her deposition testimony that a review of Plaintiff's MAR evidenced that Plaintiff sometimes received his medication off-schedule.   Plaintiff asserts Brown's grievance response evidences deliberate indifference because she was notified of issues with the administration of his Humira and failed to address these issues so it would not happen again.   The Court disagrees.

Brown's grievance response, while incorrectly stating Plaintiff had received his medication timely, cites only one instance wherein the fourteen-day period between Humira shots was not followed.   This is, at most, evidence of negligence.   The Court also cannot find that Brown's failure to review the Syringe Log in responding to this grievance and noting any discrepancies is deliberate indifference.   Again, this is negligence at most.   Deliberate indifference is not akin to negligence and the Court finds that allowing Plaintiff to proceed on this claim against Brown based

on a grievance response that did not even specifically identify Brown (the Court only presumes it was Brown based on the reference to "HCUA"), that merely incorrectly determined Plaintiff had received Humira injections on schedule does not amount to any finding that Brown was aware that a substantial risk of serious harm existed to Plaintiff and that she failed to respond appropriately to such a risk.   The Court finds that, at most, Brown provided a sloppy response to a grievance. This does not amount to deliberate indifference.

### Kelli Blaise

Defendant Blaise was the Director of Nursing at all times relevant.   The evidence establishes that she never administered a Humira injection to Plaintiff.   However, there is evidence that Blaise was made aware of issues with the timeliness of the administration of Plaintiff's Humira injections through a grievance and was specifically notified that Plaintiff had received a Humira injection on June 16 and on June 19, 2019.   Plaintiff contends Defendant Blaise was deliberately indifferent because she failed to take sufficient action to ensure Plaintiff received his medication at the proper interval after being advised of issues concerning the same.   Blaise asserts she is not liable on this basis because Plaintiff's allegations seek to hold her liable under *respondeat superior* principles, which are not allowed under § 1983.

The Court finds that Plaintiff's claimed basis for liability is not necessarily predicated on *respondeat superior* principles. Indeed, under § 1983, personal liability may be established when an official knows "about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006) (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)).   This is the more appropriate analysis in light of the factual record.   Here, there is no evidence that Blaise ever administered a Humira injection to Plaintiff.   However, the record supports a finding that

Blaise was responsible for ensuring the nursing staff at Pinckneyville administered Plaintiff's Humira shots on schedule.   The record establishes that Blaise was advised of at least two instances wherein shots were not administered on schedule, and that she took corrective action to address the same.   Blaise met with nursing staff and the staff who made errors in the administration of Plaintiff's medication and advised them of the importance of following the prescription schedule. Blaise also advised that disciplinary action may result if there are errors.   This is evidence that Defendant Blaise did not ignore issues with the administration of Plaintiff's Humira.   Thus, even though there were repeated instances wherein Plaintiff was administered Humira beyond the parameters of his prescription, no reasonable jury could find that Defendant Blaise was deliberately indifferent to the same.   For these reasons, Defendant Blaise is entitled to summary judgment on Count Five.

**Bryan Kelley**

Plaintiff alleges RN Kelley was deliberately indifferent in giving Plaintiff an untimely dose of Humira on July 16, 2019.   Defendant Kelley asserts his administration of two doses of Humira on July 16, 2019 was not evidence of deliberate indifference as he merely misread the prescription order and, after he made the medication error, he notified Dr. Myers and DON Blaise.   As such, Defendant Kelley asserts his actions amounted to negligence at most as there was no intentional or criminally reckless conduct.

The Court agrees.   Again, the standard here is not negligence.   Inadvertent errors such as Kelley's, while concerning, are not a basis for liability under the Eighth Amendment.   *See Duerson v. Hadley*, No. 20-3271, 2021 WL 6102170, at *1 (7th Cir. 2021) (upholding district court's summary judgment in favor of the defendant who administered the plaintiff two doses of a prescription anti-seizure medication that was intended for another inmate, finding the failure to

double-check the inmate number "might support a claim of negligence," but is insufficient to establish deliberate indifference).   It is clear that Kelley made an error in dispensing two doses of Humira on July 16, 2019.   However, it is also apparent that he acted to address his error and advise Dr. Myers and Blaise of the same.   This is not evidence of a reckless disregard to Plaintiff's health. For these reasons, Defendant Kelley is entitled to summary judgment on Count Five.

**Laura Mileur**

Plaintiff alleges Defendant Nurse Mileur was deliberately indifferent to his ulcerative colitis in failing to properly complete Plaintiff's Medication Administration Record resulting in the misadministration of Plaintiff's Humira treatment.

The record establishes that Defendant Mileur provided Plaintiff a dose of Humira on June 16, 2019.   Defendant Mileur, however, failed to document the same in Plaintiff's Medication Administration Record.   As a result, Plaintiff was provided another dose of Humira on June 19, 2019.   After the June 19, 2019 dose was administered and the issue came to the attention of Defendant Blaise, Defendant Blaise advised Mileur to update Plaintiff's MAR to reflect that she provided a Humira injection shot to Plaintiff on June 16, 2019.   Mileur updated the MAR as directed.

The Court finds that this error in documentation amounts to negligence at most, and the standard here is deliberate indifference.   The Court finds no evidence that Mileur's actions were the result of deliberate or criminal reckless actions.   For these reasons, Defendant Mileur is entitled to summary judgment on Count Five.

**Jana Rueter**

Plaintiff asserts Defendant RN Rueter was deliberately indifferent in administering a dose of Humira on June 19, 2019, three days after Plaintiff received his June 16, 2019 injection.   The

evidence establishes that Rueter administered the June 19, 2019 Humira injection after seeing Plaintiff for complaints of stomach pains wherein Plaintiff told Rueter he had not received his Humira injection as prescribed (Doc. 139-6 at 74; *see* Doc. 139-8 at 38-39).   Rueter reviewed the MAR and found that Plaintiff had not received an injection as scheduled for June 16, 2019 (Doc. 139-6 at 74).   Rueter filled out a medication error form and was advised by Blaise to provide Plaintiff a Humira injection (Doc. 139-6 at 75).   After Rueter administered the injection, Blaise reviewed the Syringe Log and saw that Plaintiff had received an injection on June 16, 2019 (Doc. 139-6 at 76).

Rueter's administration of a Humira injection to Plaintiff on June 19, 2019 was certainly not within the prescribed timeframe; however, it is not evidence of deliberate indifference. Rueter's actions were the result of an error by other staff members, including Defendant Mileur. There is no evidence that Rueter's actions were deliberate or criminally reckless.   As such, Defendant Rueter is entitled to summary judgment as to Count Five.

**Danielle Anderton**

Plaintiff alleges Defendant RN Anderton was deliberately indifferent in administering a Humira injection on July 2, 2019, just thirteen days after his previous injection given on July 19, 2019.   The Court's analysis of this claim is abbreviated as it is apparent that a one-day difference in the administration of Plaintiff's Humira is not evidence of deliberate indifference.   While the Court again does not condone the provision of medication outside of a prescribed course, there is no indication that a one-day difference caused Plaintiff harm or that it was conduct that amounted to deliberate indifference.

Defendant Anderton is entitled to summary judgment as to Count Five.

***Count Six – Eighth Amendment falsification of medical records against Brown***

Plaintiff alleges that Brown had knowledge that his medical records were not accurate and failed to effectively intervene.   Brown asserts there is no evidence she falsified any of Plaintiff's records and insofar as there was any information contained in Plaintiff's chart on which Defendant Brown relied that was incorrect, falsified, or may have been read incorrectly, it is not evidence of falsification by Brown.

Plaintiff did not respond to Brown's argument on this claim.

The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to "provide humane conditions of confinement, … ensure that inmates receive adequate food, clothing, shelter, and medical care, and … 'take reasonable measures to guarantee the safety of inmates.'"   *Balle v. Kennedy*, 73 F.4th 545, 552 (7th Cir. 2023) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)) (other citations omitted).   An official violates the Eighth Amendment if he exhibits deliberate indifference to a substantial risk of serious harm to an inmate. *Balle*, 73 F.4th at 552 (citations omitted).

There is no evidence that Brown falsified Plaintiff's medical records.   As such, there is no basis for finding that Brown acted with deliberate indifference to a serious risk of harm to Plaintiff. Defendant Brown is entitled to summary judgment as to Count Six.

***Count Eight – First Amendment retaliation claim against Lt. Frank and Warden Thompson***

Plaintiff claims Defendants Frank and Thompson retaliated against him for filing grievances and complaints by raising Plaintiff's security risk and effecting Plaintiff's transfer to another facility.

As set forth in more detail above, for a plaintiff to prevail on a First Amendment retaliation claim, he must show that: (1) he engaged in activity protected by the First Amendment; (2) he

Page **41** of **45**

suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendant's decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)) (other citations omitted).

Defendants admit that Plaintiff engaged in protected First Amendment activity and that a transfer may be a deprivation likely to deter First Amendment activity if done for retaliatory purposes. Defendants argue, however, that Plaintiff's transfer from Pinckneyville to Lawrence was not motivated by retaliation due to Plaintiff's filing of grievances and a PREA complaint. In support of their motion, Defendants explain that following an Internal Affairs investigation into Plaintiff's claim of sexual assault against Dr. Myers and medication issues, Defendant Lt. Frank recommended a lateral transfer to another facility. Defendant Thompson approved the transfer and it was ultimately carried out.

Plaintiff has not set forth any evidence, direct or circumstantial, to substantiate his claim that the transfer was retaliatory. While the Court may infer that Plaintiff is attempting to rely on timing, as set forth above, timing is rarely sufficient to survive summary judgment, and the Seventh Circuit has required a plaintiff to provide other evidence, beyond timing, to support the inference of a causal link. *Coleman v. Donahoe*, 667 F.3d 835, 860-61 (7th Cir. 2012). There is no other evidence of any retaliatory purpose related to this transfer. Indeed, the evidence substantiates Defendants' claim that the transfer was motivated to address errors in Plaintiff's medication administration. This was documented by both Defendants Frank and Thompson, and is supported by the fact that both Pinckneyville and Lawrence were medium security institutions at the relevant time. This is not, as Plaintiff proposes, an instance wherein there is a "swearing contest" between the parties. Plaintiff's burden is to produce some evidence of retaliatory motive and he has failed

to do so.   For these reasons, Defendants Thompson and Frank are entitled to summary judgment on Count Eight.

***Count Nine – Eighth Amendment deliberate indifference claim against Officer Jurkowski***

Plaintiff alleges that Defendant Officer Jurkowski was deliberately indifference in denying Plaintiff's request for medical attention on June 19, 2019, resulting in a delay in Plaintiff being seen in the healthcare unit.

The evidence, when viewed in the light most favorable to Plaintiff, establishes that Plaintiff advised Jurkowski of his need for medical attention around 3:00 a.m. on June 19, 2019. Jurkowski knew Plaintiff was experiencing pain from GERD, but ignored Plaintiff's complaints. Ultimately, Plaintiff complained again of his symptoms on the gym line around 9:00 a.m. and was seen in the healthcare unit soon thereafter (*see* Doc. 139-*8* at 38-39).   Dr. Myers saw Plaintiff on June 19, 2019 and admitted him to the infirmary for his colonoscopy and endoscopy.   Dr. Myers also issued prescriptions in his "Plan" for Plaintiff[2].

Officer Jurkowski asserts summary judgment in his favor is warranted because even if a jury could find that Plaintiff made a request to him for medical care, Plaintiff has not presented any medical evidence demonstrating that the delay caused Plaintiff harm.   The Court agrees. While a delay in treating non-life-threatening but painful conditions may constitute deliberate indifference, the Court considers the length of the delay, the seriousness of the condition, and the ease of providing treatment.   *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011).   For comparison, in *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), the Seventh Circuit found that prison officers could be liable for delaying treatment for an inmate's painful, broken nose by

---

[2] It appears Dr. Myers ordered various medications for Plaintiff; however, neither party has identified the medications (and the Court is unable to discern the same) and what condition(s) they were meant to address (*see* Doc. 139-8 at 38).

at least a day-and-a-half, while in *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997), the Seventh Circuit upheld dismissal of the case for failure to state a claim on allegations that an inmate was made to wait six days to see a doctor for an infected cyst deemed not that severe.

In light of these considerations, the Court finds the brief delay of six hours caused by Defendant Jurkowski's alleged failure to respond to Plaintiff's medical complaints does not rise to deliberate indifference because there is no evidence that Plaintiff suffered from a severe, emergency, or urgent condition.   Indeed, Plaintiff indicated he advised Jurkwoski he was experiencing pain from his GERD, a chronic condition.   While Plaintiff was ultimately admitted to the infirmary for his colonoscopy and endoscopy, these procedures had already been approved and there is no indication they were done on an emergency basis due to Plaintiff's complaints. Indeed, Plaintiff has failed to demonstrate that his condition on June 19, 2019 was so severe so as to establish that a mere six-hour delay rose to the level of deliberate indifference.

Defendant Jurkowski is entitled to summary judgment as to Count Nine.

### *Dr. Randy Reddling*

The Court notes that Plaintiff voluntarily dismissed without prejudice Count Four against Defendant Reddling.   It appears Defendant Reddling was never served and he has not entered an appearance.   Thus, the Court finds dismissal without prejudice is appropriate against Dr. Reddling pursuant to Federal Rule of Civil Procedure 41(a).

## <u>Conclusion</u>

Based on the foregoing, the Motion for Summary Judgment filed by Defendants Percy Myers, Bryan Kelley, Laura Mileur, Kelli Blaise, Jana Reuter, Danielle Anderton, and Wexford Health Sources, Inc. (Doc. 138) is **GRANTED IN PART AND DENIED IN PART**; the Motion for Partial Summary Judgment filed by Plaintiff Deandre Davis (Doc. 140) is **DENIED**; and the

Motion for Summary Judgment filed by Defendants Christopher Scott Thompson, Sylvia Lane, Christine Brown, Mac-Shane Frank, and Justin Jurkowski (Doc. 142) is **GRANTED**.

The Clerk of Court shall enter judgment in favor of Defendants Bryan Kelley, Laura Mileur, Kelli Blaise, Jana Rueter, Danielle Anderton, Wexford Health Sources, Inc., Christopher Scott Thompson, Sylvia Lane, Christine Brown, Mac-Shane Frank, and Justin Jurkowski and against Plaintiff at the close of this case.

Plaintiff shall proceed on the following claim:

Count Two:    Eighth Amendment claim against Dr. Myers for cruel and unusual punishment by sexually assaulting Plaintiff during a medical appointment.

**IT IS SO ORDERED.**

**DATED: September 15, 2023**

_s/_  _Reona J. Daly_
**Hon. Reona J. Daly**
**United States Magistrate Judge**